### STATE *EX REL.* McDONALD v. COURTENAY.

1. The board of pilotage commissioners of Charleston have the power to suspend a pilot and reduce his license, under either section 1266 or section 1267 of the General Statutes, as the facts may warrant, without specifying in their charge the precise section under which they are proceeding.
2. In proper cases, pilotage boards are subject to *mandamus* at the suit of pilots of their appointment removed from office. MR. JUSTICE McIVER *not concurring.*
3. The summons in this case to a pilot to appear before the commissioners of pilotage was sufficient, as it apprised the pilot of the charge against him and of the investigation to be had. And the general finding by the board, of dereliction of duty, was sufficient.
4. A majority of the commissioners was sufficient to constitute the board, and it was not necessary that those present and acting should sign the finding. *Gen. Stat.,* § 1267.
5. The board having the power to revoke a pilot's license, they could suspend him for three months, and reduce his license from that of full branch to twelve-foot branch.
6. This board has the power to ascertain and determine the fitness of pilots for their office, but not to punish them for crime. In investigating a charge against a pilot for negligence in grounding a steamship, if he is refused the privilege of being represented by counsel in the cross-examination of witnesses, and in argument, he will not, for such refusal, be entitled to a writ of *mandamus* to restore him to his office from which he has been removed on account of such negligence.

This was an application to the Supreme Court for a writ of *mandamus.* The opinion fully states the case.

*Mr. J. P. K. Bryan,* for relator.

*Messrs. Simonton & Barker,* contra.

July 3, 1885. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. This is a proceeding within the original jurisdiction of this court in which a *mandamus* is prayed by the relator against the respondents. The relator had been a full branch pilot of the bar and harbor of Charleston for a period of twenty years up to and before the 15th day of Janu-

ary last (1885).   On that day he was suspended by a letter from the harbor commissioners, of which the following is a copy:

"OFFICE OF THE HARBOR COMMISSIONERS,
"CHARLESTON, S. C., January 15, 1885.
"*Capt. George McDonald, Charleston:*

"DEAR SIR: At a special meeting of the board of harbor commissioners held this day the following resolutions were adopted:

" '*Resolved,* That the letter of the master of the British steamship, Harbinger, and the circumstances attending the said steamship getting ashore be considered by this board at an adjourned meeting to be held to-morrow afternoon, 16th, at 5 o'clock, at which meeting the said pilot and witnesses shall be summoned to attend.

" '*Resolved,* That pending the investigation of this case, the pilot, George McDonald, be suspended.'

"You will immediately surrender your license to the harbor master and attend the meeting of the board, at their rooms, to-morrow afternoon, at 5 o'clock P. M.

"Respectfully yours,
"(Signed)   JAMES ARMSTRONG, Sect."

On the day (the 16th) and at the time mentioned, the commissioners met, with witnesses summoned, the relator and counsel being present, and though no written charges with specifications, other than the letter above, were made and served on the relator, yet an investigation was had as to the circumstances attending the steamship Harbinger getting ashore.   In this investigation, witnesses, after being duly sworn, were examined, with the right of cross-examination freely afforded to and exercised by the relator, as it is said in the return to the rule.   It appears, however, that the counsel of the relator was not allowed to participate in this examination, nor was he allowed to represent the relator by argument.   It appears, further, that before the investigation began, the relator demanded, by his counsel, from the board, "to declare unto him what charges, if any, were preferred against him, and also demanded written specifications of such charges, if

any. That he further demanded the right that his counsel be present to cross-examine all witnesses produced, and to present and make, by addressing the said board, any proper defence of your petitioner. All of which demands were .severally denied by said board, whereupon his counsel, on his behalf, formerly protested." These facts are stated in the petition and not denied in the return. The investigation resulted in an order "suspending the relator for three months, at the expiration of which time he be given a twelve-foot branch." At the next ensuing meeting of the board in February, 1885, the relator demanded, in writing, that said board rescind the action of January 16, and forthwith restore him to his office of full branch pilot, which was refused; whereupon his petition for a *mandamus* requiring the said board to restore the relator to the office of full branch pilot in and for the harbor of Charleston was filed. The respondents, in their return to the rule requiring them to show cause, claim that they had full jurisdiction of this matter by virtue of section 1266 of the General Statutes, and that being satisfied, especially from the testimony of the relator, offered as a witness for himself, "that he had not sounded the channels of the bar for three months, they saw sufficient cause to order and direct the relator, who was the pilot in charge of the Harbinger at the time of the disaster, to give up his license for a period of three months, and to further order that when the new license should be issued, it should be regulated according to his fitness as was discovered in the investigation then had, and be limited to a twelve-foot branch or license, permitting him, however, to remain as a pilot of the bar of Charleston, and not depriving him of his license as such."

Section 1266, under which the respondents claim to have acted, is as follows: "Said board shall have power and authority, for any cause or charge to them satisfactorily proven, to order and direct any and all pilots, for the port to which they belong, to deliver his or their licenses, and to take out a new license or licenses; but no pilot, who shall satisfy them of the groundlessness of such cause or the falsity of such charge brought against him, shall be required to pay any additional fee for his new license."

It cannot be seriously contended that if the cause for which the

pilotage commissioners herein took action against the relator and suspended him, was founded in fact and properly established, that he would be entitled to the writ which he seeks.    Because, under the section *supra* of the pilotage act (*Gen. Stat.*, p. 369), it seems to us that in such case the pilotage commissioners would be, fully warranted in doing what they have done.    In fact, under this section the license of a pilot might possibly be withdrawn altogether, subject to the right of said pilot to apply for a renewal without any additional fee, upon proof of the groundlessness or falsity of the charge upon which action had been taken by the commissioners.

But if there could be any doubt as to the application of section 1266, can such doubt exist as to the application of section 1267, where it is provided that upon a charge of dereliction of duty made and proven against a pilot, his license may be taken away for a given time, or it may be declared absolutely null and void, as the nature of the case may demand ?    And this power, by this section, is lodged with a majority of the board.    The relator contends in his argument here, that the commissioners were acting under this latter section.    This section is a part of the general law governing pilots and pilotage commissioners, as is section 1266, and in the investigation of a case involving the conduct of pilots by a commission like that of pilotage commissioners, where no special rules of procedure are provided, we do not think that it could be made a ground fatal to the proceeding, that the pilot charged with misconduct was not informed under which precise section of the act the alleged misconduct was forbidden.    The proceeding of a commission of the character like the pilotage commission must necessarily be somewhat informal, and in the investigation of a charge against a pilot, when he is informed of the character of the charge, in substance and in fact, he is as well prepared to meet it as if the precise section of the act alleged to be violated is pointed out to him.

Supposing that the relator here was properly summoned and was before the commissioners with a charge of dereliction of duty made in connection with the steamship Harbinger, of which he had notice, we think the commissioners had the power to act under either section, 1266 or 1267, as the facts warranted, not-

withstanding the precise section under which the commissioners were acting was not mentioned in the charge.

It is not necessary to discuss here the question, whether this board of pilotage commissioners can be made the subject of *mandamus* proceeding. This has been somewhat considered in the case of *State ex rel. Stephens* v. *Pilotage Commissioners of Beaufort and St. Helena* (*ante*, p. 175), filed at the same time with this case. And under the cases in 1 and 2 *Bay*, referred to in that case, we have conceded that in a proper case these pilotage boards may be subject to a *mandamus*, in the removal from office of pilots appointed by them.

The question to be considered, then, in the case now before the court is narrowed down to one of procedure. The relator complains : 1. That there was no charge or specification before trial. 2. That he was denied the right of counsel in the cross-examination of witnesses and in argument. 3. That the finding was the general indefinite opinion that he had been derelict of duty without particularising in what. 4. That eight only of the commissioners were present and acted. 5. That this abstract finding even is not signed by the eight commissioners who were present. 6. That the sentence was twofold : suspension for three months, and then taking away full branch and giving pilot a twelve-foot branch.

As to the first, we think the resolution of the board found above, and in which the relator was informed that the master of the steamship Harbinger having complained to the board that his ship had struck in crossing the bar, this matter would be investigated, with witnesses summoned at a time specified, and that pending such investigation he, the pilot, was suspended, was quite sufficient, as a charge upon him that he was the cause of the disaster, and that his conduct therein would be the subject of inquiry and investigation at the time mentioned. That he so regarded and understood it is evidenced by the fact that at the time mentioned he appeared with his counsel to answer and defend. Remembering, as we have already said, that pilotage commissioners do not constitute a regular court, with rules of procedure deliberately prepared and adopted or required, but that it is a mere commission, charged with limited duties and with special functions,

we think their action in the matter of the charge here, and the notice of trial to the relator, was ample.

As to the third ground, that the finding was a general indefinite opinion of dereliction of duty, without particularising in what—we do not think this can be sustained.   The relator was evidently charged with dereliction of duty in connection with the ship Harbinger getting ashore, which as pilot he was guiding across the bar.    After full investigation, with several witnesses examined and cross-examined, including the relator himself, upon inquiry by the chairman of the board to each member, asking each to give his views, each and all present answered that Geo. McDonald had been derelict in his duty.    Derelict in what? Why, certainly in producing the disaster which had been charged upon him, the investigation of which had just closed.

4th. That eight only of the commissioners were present and acted.    This was a majority, and under section 1267 a majority may act.

5th. That the abstract of finding is not signed even by the eight.    There is nothing in the act which requires the finding to be signed at all, and there is no allegation that the finding, as announced, was not the finding of the board.

6th. That the sentence was twofold.    It was within the power of the board to declare the license of the relator null and void. It did not go that far; it simply suspended upon conditions. The less is within the greater, and if the relator is unwilling to take a twelve-foot branch for the future, that is a matter for him.

This brings us to the second objection, which, in our opinion, having the most substance, has been reserved for the last.    It would have been better, probably, for the board to have allowed the relator to be represented by counsel, both in the cross-examination of the witnesses and in argument.    This is usual in trials involving the rights of parties; in fact, is guaranteed by the constitution, where a party is charged with a crime or offence.    In such cases he is entitled to a speedy and public trial by an impartial jury, and to be fully heard in his defence by himself or by his counsel, or by both, as he may elect.    *Art.* I., § 13.    Here the relator, however, was not charged with crime or other offence, in the sense of this section of the constitution.    The pilotage

board is not a board organized for trying crimes or misdemeanors. Its functions, in reference to the appointment of pilots and their suspension or removal from office, have been granted in the nature of powers by which to ascertain and determine the fitness and capacity of such pilots, and in the interest of commerce to secure at all times perfectly safe and reliable pilots, and not for the purpose of punishing crime in such pilots. We do not think, therefore, that the section of the constitution referred to applies.

But there is another section of the constitution which may apply (*Art. II.*, § 31): "Officers shall be removed for incapacity, misconduct, or neglect of duty, in such manner as may be provided by law, where no mode of trial or removal is provided in this constitution." Now, section 1267 of the pilotage act provides a mode for removal or suspension of pilots, with the condition that each and every pilot against whom any charge be made shall be entitled to a hearing before the said board of commissioners, and to make any proper defence to such charge, &c. Here the pilot charged appeared before the board at the time to which he was notified. He certainly knew fully the character of the charge against him. He entered upon the trial, and cross-examined the witnesses fully. He offered himself as a witness, and upon the close of the examination he was asked if there was anything not covered by the questions which he wished to state; if so, to say to the board anything that would explain this damage to the steamship Harbinger; and he replied that he had nothing more to add.

Under these circumstances, although the board declined to hear argument on the case from counsel, we do not see that the great prerogative writ of *mandamus* should be issued as a matter of right to the relator, requiring the pilotage board to restore him to his office, in face of the fact solemnly found by the board, and which, it seems, is sustained by the evidence, that he had been neglectful of his duty to such extent as to have grounded a British steamship in guiding it across the bar, doing such damage as necessitated its return into port.

It is ordered that the rule be discharged.

MR. JUSTICE McGOWAN concurred.

MR. JUSTICE McIVER.  I concur in the result, but am not prepared to assent to the proposition that *mandamus* is the proper mode of obtaining the relief sought.